

ORIGINAL

**UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

JUL 19 2013

U.S. COURT OF
FEDERAL CLAIMS

---

AMERICAN EUROPEAN INSURANCE COMPANY, On Behalf of itself and All Others Similarly Situated,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendants.

---

**Case No.**

**CLASS ACTION COMPLAINT**

13-496 C

**DEMAND FOR JURY TRIAL**

Plaintiff American European Insurance Company (collectively, "Plaintiff"), by the undersigned attorneys, submit this Class Action Complaint against the defendant named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of itself and a class (the "Class," as defined herein) of holders of junior preferred stock issued by either the Federal National Mortgage Association ("Fannie Mae" or "Fannie") or the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"), seeking just compensation for the taking of their property by the United States of America, including the Department of the Treasury, the Federal Housing Finance Administration ("FHFA"), and agents acting at their direction (collectively, the "Government").

2.      In September of 2008, the Government (acting through the FHFA) placed Fannie Mae and Freddie Mac into conservatorship, putting it under the control of the FHFA, which is an agency of the Government. While not conceding the propriety of FHFA's decision to place

1

Fannie Mae and Freddie Mac into conservatorship, this case does not challenge the propriety of that decision or claim that it was a taking.

3.     In connection with the conservatorships, the Government (specifically, the U.S. Treasury) entered into substantially identical Preferred Stock Purchase Agreements (the "Agreements") with both Fannie Mae and Freddie Mac. Under these Agreements, the Treasury acquired from each company preferred stock (the "Senior Preferred Stock") that (i) is senior in priority to all other series of Fannie Mae and Freddie Mac preferred stock (all such other series of Fannie and Freddie preferred stock shall be referred to as the "Junior Preferred Stock"), (ii) was given an initial face value of $1 billion, but also provided that this face value would be increased by any amount the Treasury invested in or advanced to Fannie Mae or Freddie Mac, (iii) would receive preferential liquidation rights (i.e., would receive face value, as increased by any Treasury investments or advances, as a liquidation preference prior to anything going to the holders of Junior Preferred Stock or Common Stock), and (iv) would earn an annual dividend of 10% of the face value (as increased by any Treasury investments or advances). In addition, each of the Agreements provided the Treasury with warrants that could be exercised at any time to allow the Treasury to acquire 79.9% of the Common Stock of Fannie and Freddie, respectively, for a nominal price.

4.     Between the start of the conservatorship in September 2008 through the beginning of 2012, the Government advanced Fannie Mae and Freddie Mac more than $188 billion-most of which was advanced to cover accounting losses reflecting excessive write-downs of assets that have turned out to be worth far more than their written down amounts. These advances increased the face value of the Senior Preferred Stock held by the Government to approximately $189

billion, entitling the Government to an annual dividend of approximately $19 billion, which translates to a quarterly dividend of just under $5 billion.

5.      By 2012 the housing market was well on its way to recovery and Fannie Mae and Freddie Mac had become profitable again, reporting increasing profits through 2011 and 2012. Indeed, by the second quarter of 2012, Fannie and Freddie made a combined quarterly profit of approximately $8.3 billion. This was the first quarter for which Fannie and Freddie reported a combined quarterly profit that exceeded the just under $5 billion quarterly dividend payable to the Treasury on its Senior Preferred Stock. Thus, by no later than the end of the second quarter of 2012, Fannie and Freddie were generating sufficient profits to pay a dividend to the holders of their Junior Preferred Stock (or to payout in a liquidation distribution, in the event of any liquidation, dissolution, or winding up of Fannie or Freddie). And there was ample cause to expect that those profits were likely to grow substantially, as they in fact have done during the past year. Nevertheless, rather than allow dividends to be distributed to the Junior Preferred Stockholders, the Government chose to act immediately in August 2012 to eliminate the rights of the holders of Junior Preferred Stock to ever receive any distribution of value from Fannie or Freddie.

6.      Specifically, on August 17, 2012, the Government unilaterally amended the terms of its Agreements with Fannie Mae and Freddie Mac, and mandated that, beginning on January 1, 2013, Fannie Mae and Freddie Mac would have to pay the Government dividends equal to their entire net worth (the "Net Worth Sweep"), leaving Fannie Mae and Freddie Mac with no funds to redeem the Government's Senior Preferred Stock or to distribute to the holders of Junior Preferred Stock, whether by dividend, redemption, or in a liquidation.

3

7.    The Government's August 2012 action appropriated the valuable contractual and property rights owned by the holders of Junior Preferred Stock for no consideration. Specifically, the Government took the Junior Preferred Stockholders' rights:

a.    To receive dividend payments from Fannie Mae and Freddie Mac. Dividends were owed to the Junior Preferred Stockholders to the extent Fannie and Freddie had profits in excess of the amount required to pay dividends to the Government on its Senior Preferred Stock based on the 10% dividend set forth in the Agreements. As of the second quarter of 2012, ensuing quarters to the date of this filing, and for most if not all quarters for the foreseeable future, Fannie and Freddie's profits in fact exceeded (and will continue to exceed) such amounts;

b.    To receive a liquidation distribution upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac, which while junior to the Senior Preferred Stock was still worth billions of dollars, given Fannie and Freddie's return to profitability and the rebound in the housing market; and,

c.    To otherwise participate, even to a limited extent, in the profits of Fannie and Freddie, whether through dividends, redemptions, liquidation, or otherwise.

8.    Plaintiff and other members of the Class paid valuable consideration to acquire these rights, and in doing so helped provide financial support for Fannie and Freddie, both before and after the conservatorship, by contributing to a viable market for Fannie's and Freddie's issued securities. Plaintiff certainly had a reasonable, investment-backed expectation that the

4

property they acquired could not be appropriated by the Government without payment of just compensation.

9.     Indeed, the contractual and property rights owned by the holders of Junior Preferred Stock were worth billions of dollars prior to being appropriated by the Government. Yet the Government has not paid the Junior Preferred Stockholders any compensation for the taking of these vested property rights.

10.     By contrast, the Government has already profited enormously from the Net Worth Sweep, and stands to profit even more in the future. For example, on or around June 30, 2013, Fannie and Freddie collectively paid dividends to the Treasury of over *$66 billion*. But for the Net Worth Sweep, that dividend would have been only approximately $4.7 billion, with the remainder available to be paid as a dividend to the Junior Preferred Stockholders. Going forward, the Treasury will continue to reap additional windfall profits as a result of the Net Worth Sweep. As the Government itself stated, the purpose of the Net Worth Sweep is to take "every dollar of earnings each firm generates .... to benefit taxpayers." While the Government's goal may be to serve the public, the Government cannot benefit taxpayers by unlawfully taking the property of the Junior Preferred Stockholders without just compensation.

11.     The current projections for Fannie and Freddie's continued profitability show that over approximately the next year, Fannie and Freddie will be able to repay to the Treasury 100% of the money they received from the Treasury, plus the required 10% annual dividend. That means that but for the Net Worth Sweep, Fannie and Freddie would be in position to pay billions of dollars in profits to the holders of Junior Preferred Stock for years to come. Instead, because of the Net Worth Sweep, the Treasury will now receive tens of billions of dollars (if not

hundreds of billions of dollars) in excess of the amount it was entitled to receive under the original Agreements, and the Junior Preferred Stockholders will receive nothing.

12.     The Treasury's blatant appropriation of the economic rights previously held by the owners of the Junior Preferred Stock was a taking of private property without payment of just compensation. It was not the result of an arm's-length agreement. To the contrary, the Government amended the Agreements governing Treasury's Senior Preferred Stock through an "agreement" between (a) the United States Treasury, which is an agency of the Federal Government, and (b) the FHFA, which is an agency of the Federal Government. Thus, the Government made an agreement with itself to appropriate private property for the benefit of the Treasury. The "amendment" to the "Agreements" that implemented the Net Worth Sweep is therefore nothing other than the unilateral appropriation for the benefit of the U.S. Treasury of all of the economic rights previously held by the Junior Preferred Stockholders.

13.     According to the Treasury and the FHFA, the imposition of this Net Worth Sweep was intended to improve the functioning of the mortgage markets and further wind down both Fannie and Freddie. Whether that is likely to be the case or constitutes good public policy is beside the point. What is indisputably true is that, for an ostensible public purpose, the Treasury and the FHFA have appropriated the private property owned by Plaintiff and the Class without payment of just compensation. It is the duty of this Court to enforce the Fifth Amendment, and to require the Government to pay for the property it has taken.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action, and venue is proper in this Court, pursuant to 28 U.S.C. § 1491(a).

## THE PARTIES

15.     Plaintiff American European Insurance Company is currently a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock, and has been a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock prior to September 6, 2008, as well as prior to and on August 17, 2012, and has been a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock throughout the relevant time period.

16.     Defendant United States of America includes the Department of the Treasury, the FHFA, and agents acting at their direction.

## CONSTITUTIONAL PROVISION

17.     Plaintiff's claim is governed by the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action on its own behalf and as a class action on behalf of those who held shares of Fannie Mae and/or Freddie Mac Junior Preferred Stock prior to, and as of, the public announcement of the Net Worth Sweep on August 17, 2012 (the "Class").

19.     This action is properly maintainable as a class action.

20.     The Class is so numerous that joinder of all members is impracticable. As of August 17, 2012, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Junior Preferred Stock outstanding. Upon information and belief, there are thousands of members of the Class.

7

21.     There are questions of law and fact which are common to the Class, including, but not limited to:

    a.  Whether the imposition of the Net Worth Sweep by the Government took Plaintiff' and the Class' property without just compensation; and

    b.  The measure of just compensation owed to Class members for the taking of their property.

22.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class, all of whom seek just compensation for the Government's taking of their rights, which affected all Fannie Mae and Freddie Mac junior preferred stockholders in the same manner. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class, including the holders of all series of Fannie Mae and Freddie Mac Junior Preferred Stock, all of whom suffered the same taking of their rights to receive dividends, liquidation distributions, or any other form of distribution on their Junior Preferred Stock.

23.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for the Government.

24.     The Government has acted on grounds that apply generally to the Class, such that relief is appropriate respecting the Class as a whole. The Net Worth Sweep was a taking of the rights of private property held by all Fannie Mae and Freddie Mac Junior Preferred Stockholders who owned Junior Preferred Stock as of August 17, 2012.

8

25.     The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## FACTUAL ALLEGATIONS

### Background of Fannie Mae. Freddie Mac. and Their Preferred Stock

26.     Fannie Mae was created by federal statute in 1938, at the request of President Franklin Delano Roosevelt, in an effort to provide a much needed supply of capital to the nation's home mortgage industry. Initially, it was authorized to purchase only those mortgages which were insured by the Federal Housing Administration ("FHA"). For the first thirty years of its existence, Fannie Mae existed and was operated by the Federal Government.

27.     In 1968, Fannie Mae was privatized pursuant to the Housing and Urban Development Act of 1968. That Act effectively partitioned the Federal National Mortgage Association into two separate and distinct entities: the reconstituted Fannie Mae and the Government National Mortgage Association ("Ginnie Mae"). Fannie Mae was reorganized as a Government-sponsored private corporation and was to serve the self-supporting secondary mortgage market. It was also authorized to purchase mortgages beyond merely FHA-insured mortgages. The other entity, Ginnie Mae, continued as a Federal Agency and was responsible for the then-existing special assistance programs.

28.     From 1968 until the events described in this Complaint, Fannie Mae has been publicly traded on the New York Stock Exchange and therefore owned by private shareholders, and has obtained funding from private capital on a self-sustaining basis.

29.     In the Emergency Home Finance Act of 1970, Congress created Freddie Mac and authorized it to create a secondary market for conventional mortgages. According to its Form 10-

K for the fiscal year ended December 31, 2012, filed with the Securities and Exchange Commission ("SEC") on February 28, 2013, Freddie Mac's "public mission [is] to provide liquidity, stability, and affordability to the U.S. housing market." Together, Fannie Mae and Freddie Mac have been referred to as "Government Sponsored Enterprises" or "GSEs."

30.     In 1992, Congress passed the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act"). The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Fannie Mae and Freddie Mac, imposed minimum capital requirements on Fannie Mae and Freddie Mac, and provided OFHEO with the authority to impose a conservatorship in the event that Fannie Mae or Freddie Mac became critically undercapitalized, as defined by the statute.

31.     In July of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (the "2008 Act"). The 2008 Act created the FHFA as the successor to OFHEO, and provided the FHFA with expanded regulatory powers over Fannie Mae and Freddie Mac. In addition, the 2008 Act authorized the FHFA to order either of the GSEs into receivership, as well as providing greater guidance regarding the statutory basis for appointing a conservator for either of the GSEs.

32.     Although they are charted by Congress and have a public mission, prior to September 6, 2008, Fannie Mae and Freddie Mac were non-governmental, publicly traded corporations owned by their stockholders. Prior to September 6, 2008, both Fannie Mae and Freddie Mac raised substantial amounts of capital from private investors in order to fund their operations. As shown below, one of the ways both Fannie Mae and Freddie Mac raised capital was by issuing preferred stock.

33.     Prior to September 6, 2008, Fannie Mae had issued several series of preferred stock with various dividend rates and stated values, including:

a.  Series D 5.25% Non-Cumulative Preferred Stock with a stated value of $50 per share;

b.  Series E 5.1 % Non-Cumulative Preferred Stock with a stated value of $50 per share;

c.  Series F Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

d.  Series G Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

e.  Series H 5.81 % Non-Cumulative Preferred Stock with a stated value of $50 per share;

f.  Series I 5.375% Non-Cumulative Preferred Stock with a stated value of $50 per share;

g.  Series L 5.125% Non-Cumulative Preferred Stock with a stated value of $50 per share;

h.  Series M 4.75% Non-Cumulative Preferred Stock with a stated value of $50 per share;

i.  Series N 5.5% Non-Cumulative Preferred Stock with a stated value of $50 per share;

j.  Series 0 Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

k.  Series P Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

l.  Series Q 6.75% Non-Cumulative Preferred Stock with a stated value of $25 per share;

m.  Series R 7.625% Non-Cumulative Preferred Stock with a stated value of $25 per share;

n.  Series S Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

   o.  Series T 8.25% Non-Cumulative Preferred Stock with a stated value of $25 per share; and

   p.  Series 2004-1 5.375% Non-Cumulative Convertible Preferred Stock with a stated value of $100,000 per share.

34.    Prior to September 6, 2008, Freddie Mac had issued several series of preferred stock with various dividend rates and stated values, including:

   a.  Series B Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

   b.  5.81 % Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 10/27/97);

   c.  Series F 5% Non-Cumulative Preferred Stock with a stated value of $50 per share;

   d.  Series G Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

   e.  Series H 5.1% Non-Cumulative Preferred Stock with a stated value of $50 per share;

   f.  5.3% Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 10/28/98);

   g.  5.1 % Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 3/19/99);

   h.  Series K 5.79% Non-Cumulative Preferred Stock with a stated value of $50 per share;

   i.  Series L Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

   j.  Series M Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

   k.  Series O 5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share;

   l.  Series P 6% Non-Cumulative Preferred Stock with a stated value of $50 per share;

m.  Series Q Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

n.  Series R 5.7% Non-Cumulative Preferred Stock with a stated value of $50 per share;

o.  5.81 % Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 1129/02);

p.  Series S Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

q.  Series T 6.42% Non-Cumulative Preferred Stock with a stated value of $50 per share;

r.  Series U 5.9% Non-Cumulative Preferred Stock with a stated value of $25 per share;

s.  Series V 5.57% Non-Cumulative Preferred Stock with a stated value of $25 per share;

t.  Series W 5.66% Non-Cumulative Preferred Stock with a stated value of $25 per share;

u.  Series X 6.02% Non-Cumulative Preferred Stock with a stated value of $25 per share;

v.  Series Y 6.55% Non-Cumulative Preferred Stock with a stated value of $25 per share; and

w.  Series Z Fixed-to-Floating Rate Non-Cumulative Preferred Stock with a stated value of $25 per share.

35.    The Certificate of Designation for each series of Fannie Mae preferred stock contains provisions governing the holders' dividend and liquidation rights, which provide in pertinent part:

**2. Dividends.**

(a) Holders of record of [the particular series of] Preferred Stock (each individually a "Holder," or collectively the "Holders") will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at [the specified

percentage rate] per annum of the [specified] stated value ... per share of [the particular series of] Preferred Stock.

\* \* \*

**4. Liquidation Rights.**

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the [particular series of] Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the [particular series of] Preferred Stock), the amount of [the stated value] per share plus an amount ... equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the [particular series of] Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of [the particular series of] Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the [particular series of] Preferred Stock, the assets will be distributed to the Holders of [the particular series of] Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any noncumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

36.     Likewise, the Certificate of Designation for each series of Freddie Mac preferred stock contains provisions governing the holders' dividend and liquidation rights, which provide in pertinent part:

**2. Dividends**

14

(a) Holders of outstanding shares of Non-Cumulative Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, non-cumulative cash dividends at the [specified] annual rate per share of Non-Cumulative Preferred Stock.

* * *

### 7. Liquidation Rights and Preference

(a) Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, the holders of the outstanding shares of the Non-Cumulative Preferred Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the NonCumulative Preferred Stock upon liquidation, the amount of [the stated value] per share plus an amount ... equal to the dividend, if any, otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up, and the holders of the outstanding shares of any class or series of stock of Freddie Mac ranking on a parity with the Non-Cumulative Preferred Stock upon liquidation shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any such payment or distribution shall be made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the Non-Cumulative Preferred Stock and to such parity stock upon liquidation, any corresponding preferential amount to which the holders of such parity stock may, by the terms thereof, be entitled; provided, however, that if the assets of Freddie Mac available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the NonCumulative Preferred Stock and the holders of the outstanding shares of such parity stock shall be entitled to receive upon such dissolution, liquidation or winding up of Freddie Mac as aforesaid, then ... all of the assets of Freddie Mac available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Non-Cumulative Preferred Stock and to the holders of outstanding shares of such parity stock pro rata, so that the amounts so distributed to holders of the Non-Cumulative Preferred Stock and to holders of such

classes or series of such parity stock respectively, shall bear to each other the same ratio that the respective distributive amounts to which they are so entitled bear to each other.

37.     Prior to September 6, 2008, each series of Fannie Mae preferred stock ranked on a parity with all other issued and outstanding series of Fannie Mae preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Fannie Mae, and each series of Freddie Mac preferred stock ranked on a parity with all other issued and outstanding series of Freddie Mac preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac. Thus, the holders of each series of Fannie Mae and Freddie Mac preferred stock had equal contractual rights to receive their respective dividends, as well as their respective liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac.

38.     Prior to September 6, 2008, Fannie Mae and Freddie Mac each regularly declared and paid dividends on each series of their respective preferred stock.

### The Conservatorships

39.     On September 7, 2008, OFHEO's Director James Lockhart, who then became director of the FHFA, announced that on the previous day (September 6, 2008), the FHFA had placed Fannie Mae and Freddie Mac into conservatorship. Mr. Lockhart described "conservatorship" as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."

40.     In his announcement, Mr. Lockhart explained that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated,

but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made." Thus, the conservatorships did not involve the appropriation of any of the outstanding preferred stock in Fannie Mae or Freddie Mac. While Mr. Lockhart orally stated that dividends would be "eliminated," there was no amendment to any of the Certificates of Designation for any of the Fannie Mae or Freddie Mac Junior Preferred Stock. Thus, this oral announcement by Mr. Lockhart did not legally modify the contractual rights of the holders of Junior Preferred Stock. Moreover, as shown below, both Mr. Lockhart's announcement and the terms of the agreements executed between the Treasury and the FHFA contemplated that future dividends could potentially be paid on the Junior Preferred Stock if the institutions returned to profitability.

41.     Mr. Lockhart's announcement also made clear that the conservatorships would be run with a view to attracting continued private investment into Fannie Mae and Freddie Mac: "Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits. It is critical to complete these regulations *so that any new investor will understand the investment proposition.*"

42.     Also on September 7, 2008, Treasury Secretary Henry Paulson announced that in connection with the conservatorships, Fannie Mae and Freddie Mac had entered into the Agreements with the Treasury Department pursuant to which the Treasury Department would receive a newly-issued series of preferred stock that would be senior in priority to all the issued and outstanding series of Fannie Mae and Freddie Mac preferred stock. Mr. Paulson explained that, "[w]ith this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares." Mr. Paulson

17

made clear that "*conservatorship does not eliminate the outstanding preferred stock*, but does place preferred shareholders second, after the common shareholders, in absorbing losses."

43.     Also on September 7, 2008, the Treasury Department issued a "Fact Sheet" describing the Agreements and explaining that the Agreements "provide significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from each GSE, quarterly dividend payments, warrants representing an ownership stake of 79.9% in each GSE going forward, and a quarterly fee starting in 2010."

44.     The Fact Sheet further stated that "The agreements are contracts between the Department of the Treasury and each GSE." It then summarized the terms of the Agreements, and clearly itemized each form of compensation being received by Treasury under the Agreements:

> In exchange for entering into these agreements with the GSEs, Treasury will immediately receive the following compensation:
>
> • $1 billion of senior preferred stock in each GSE
>
> • Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully diluted basis at a nominal price
>
> • The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.
>
> • senior preferred stock shall not be entitled to voting rights. In a conservatorship, voting rights of all stockholders are vested in the Conservator.
>
> • Beginning March 31, 2010, the GSEs shall pay the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the

agreement. The Secretary of the Treasury and the Conservator
shall determine the periodic commitment fee in consultation with
the Chairman of the Federal Reserve. This fee may be paid in cash
or may be added to the senior preferred stock.

45.     In addition, the Fact Sheet summarized a series of "covenants" made by Fannie

Mae and Freddie Mac to Treasury as part of the Agreements, including the covenant that,

"Without the prior consent of the Treasury, the GSEs shall not ...... Make any payment to

purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other

than dividends on the senior preferred stock)." Notably, there was no covenant that prohibited

any future payment of dividends to holders of the Junior Preferred Stock; nor was there any

indication at all that the Treasury would refuse to consent to any dividends ever being paid on

the Junior Preferred Stock even if Fannie and Freddie returned to profitability and were able to

repay the Treasury its entire investment plus a substantial profit. Moreover, there was no

covenant preventing Junior Preferred Stockholders from receiving their pro rata share of any

liquidation value in Fannie Mae or Freddie Mac.

46.     On September 11, 2008, Fannie Mae filed with the SEC a Form 8-K disclosing

further details regarding its conservatorship and Preferred Stock Purchase Agreement with the

Treasury Department. Among other things, this Form 8-K stated that "FHFA, as Conservator,

has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of

FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract

is burdensome and that repudiation of the contract promotes the orderly administration of Fannie

Mae's affairs. FHFA's right to repudiate any contract must be exercised within a reasonable

period of time after its appointment as Conservator." FHFA did not, either within a reasonable

period of time of its appointment as Conservator or at any other time before August 17, 2012,

purport to repudiate any of the contracts governing the issuance by Fannie Mae and Freddie Mac

of the various series of preferred stock listed above and now described as the Junior Preferred

Stock.

47.     In summarizing the terms applicable to the Senior Preferred Stock issued to

Treasury, the Form 8-K stated:

> The Senior Preferred Stock ranks prior to Fannie Mae common
> stock and all outstanding series of Fannie Mae preferred stock
> (which are listed in Item 3.03 above), as well as any Fannie Mae
> capital stock issued in the future, *as to both dividends and rights
> upon liquidation*. The Certificate of Designation for the Senior
> Preferred Stock provides that Fannie Mae may not, at any time,
> declare or pay dividends on, make distributions with respect to, or
> redeem, purchase or acquire, or make a liquidation payment with
> respect to, any common stock or other securities ranking junior to
> the Senior Preferred Stock unless (a) full cumulative dividends on
> the outstanding Senior Preferred Stock in respect of the then
> current dividend period and all past dividend periods (including
> any unpaid dividends added to the liquidation preference) have
> been declared and paid in cash, and (b) all amounts required to be
> paid with the net proceeds of any issuance of capital stock for cash
> have been paid in cash.

> (Emphasis added).

48.     Thus, the terms of the Agreements governing the Senior Preferred Stock issued to

Treasury (as summarized in the Form 8-K) contemplated that it would be possible to pay

dividends to the Junior Preferred Stockholders, so long as all cumulative dividends had been paid

in cash on the Senior Preferred Stock and Treasury's "Commitment" to provide funding had

terminated, e.g., in connection with redemption of the Senior Preferred Stock.

49.     The Form 8-K's summary of the Agreements governing the Senior Preferred

Stock also contemplated that the Senior Preferred Stock would be redeemed at some future date

in connection with the termination of the Treasury's "Commitment" to provide funding: "If after

termination of the Commitment, Fannie Mae pays down the liquidation preference of each outstanding share of Senior Preferred Stock in full, the shares will be deemed to have been redeemed as of the payment date."

### Fannie Mae and Freddie Mac's Debt to the Government
### Balloons to More Than $188 Billion

50.     Since Fannie Mae and Freddie Mac have been in conservatorship, the Treasury Department has caused Fannie Mae and Freddie Mac to draw billions of dollars from the Government. The funds drawn from the Government have been added to the original $1 billion face value of the Government's Senior Preferred Stock in each of Fannie Mae and Freddie Mac, and have thereby increased exponentially the amount Fannie Mae and Freddie Mac must eventually pay the Government to redeem their respective Senior Preferred Stock. To a large degree, the billions in dollars of funding from Treasury reflects (a) excessive write downs of the assets held by Fannie and Freddie which triggered losses that are now being reversed, as it turns out that these assets were worth substantially more than their written down values; and (b) the need to borrow cash from Treasury in order to pay Treasury its 10% annual coupon on its Senior Preferred Stock.

51.     On February 26, 2009, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2008, which disclosed that "[a]t December 31, 2008, our total liabilities exceeded our total assets, as reflected on our consolidated balance sheet, by $15.2 billion," and therefore "[t]he Director of FHFA submitted a request on February 25, 2009 for funds from Treasury on our behalf under the terms of the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2008 .... Accordingly, the

amount of the aggregate liquidation preference of the senior preferred stock will increase to $16.2 billion as a result of our expected draw."

52.     On March 11, 2009, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2008, which disclosed that "[t]he Director of FHFA has submitted a draw request to Treasury under the Purchase Agreement in the amount of $30.8 billion, which we expect to receive in March 2009. When this draw is received ... the aggregate liquidation preference of the senior preferred stock will increase from $1.0 billion as of September 8, 2008 to $45.6 billion."

53.     On February 24, 2010, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2009, which disclosed that "[a]s a result of draws under the Purchase Agreement, the aggregate liquidation preference of the senior preferred stock has increased from $1.0 billion as of September 8, 2008 to $51.7 billion as of December 31, 2009."

54.     On February 26, 2010, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2009, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $60.9 billion as of December 31, 2009 and will increase to $76.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2009."

55.     On February 24, 2011, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010."

56.     On February 24, 2011, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010, which disclosed that "[t]he draws received during 2010 increased the aggregate liquidation preference of the senior preferred stock to $64.2 billion at December 31, 2010 from $51.7 billion at December 31, 2009. To address our net worth deficit of $401 million as of December 31, 2010, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million. Upon funding of the draw request. . . our aggregate funding received from Treasury under the Purchase Agreement will increase to $63.7 billion."

57.     On February 29, 2012, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2011, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $112.6 billion as of December 31, 2011 and will increase to $117.1 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2011."

58.     On March 9, 2012, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2011, which disclosed that "[w]e had a net worth deficit of $146 million as of December 31, 2011, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $146 million. Upon funding of the draw request. . .our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion."

59.     Thus, as of the beginning of 2012, Fannie Mae's cost to redeem the Government's Senior Preferred Stock in Fannie had ballooned from the original $1 billion to $117.1 billion, and Freddie Mac's cost to redeem the Government's Senior Preferred Stock in Freddie had increased from the original $1 billion to $72.3 billion-resulting in a total face amount (and liquidation

preference) for the Government's Senior Preferred Stock III both Fannie and Freddie of approximately $189.4 billion.

60.     Nevertheless, while the Treasury's large infusions of cash into Fannie and Freddie created substantial priority rights for the Senior Preferred Stock, it did not eliminate the rights of the Junior Preferred Stock, which continued to be entitled to dividends payable after all dividends paid on the Senior Preferred Stock, and to a liquidation preference after the liquidation preference on the Senior Preferred Stock was satisfied. For example, as of March 31, 2013, the aggregate liquidation preference of all of the Junior Preferred Stock in Fannie and Freddie was approximately $33 billion. As shown below, the growing profitability of Fannie and Freddie during 2012 soon confirmed that, despite being junior to the Treasury's Senior Preferred Stock, the Junior Preferred Stock was worth billions of dollars.

**Fannie Mae and Freddie Mac Become Profitable**

61.     After three years in conservatorship, both Fannie Mae and Freddie Mac began to report significant profits, reflecting the recovery of the broader housing market and the increased value of the assets that both Fannie and Freddie had been forced to write down. Thus, by the first quarter of 2012, Fannie Mae had no need to draw additional funds from the Government because instead of generating losses, it began generating profits.

62.     On May 9, 2012, Fannie Mae filed with the SEC its Form 10-Q for the first quarter of 2012, which disclosed Fannie Mae's first quarterly profit since before the conservatorship. In the Form 10-Q Fannie Mae reported "total comprehensive income of $3.1 billion in the first quarter of 2012, consisting of net income of $2.7 billion and other comprehensive income of $362 million" and "net worth of $268 million as of March 31, 2012 [which] reflects our total comprehensive income of $3.1 billion largely offset by our payment to

Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012."
Fannie Mae further reported that "[a]s a result of our positive net worth as of March 31, 2012, we
will not request a draw this quarter from Treasury under the senior preferred stock purchase
agreement. "

63.     Fannie Mae's profitability grew in the second quarter of 2012. On August 8,
2012, Fannie Mae filed with the SEC its Form 10-Q for the second quarter of 2012, in which
Fannie Mae reported "comprehensive income of $5.4 billion in the second quarter of 2012,
consisting of net income of $5.1 billion and other comprehensive income of $328 million" and
"net worth of $2.8 billion as of June 30, 2012 [which] reflects our comprehensive income of $8.5
billion offset by our payment to Treasury of $5.8 billion in senior preferred stock dividends
during the first half of 2012 .... As a result of our positive net worth as of June 30, 2012, we are
not requesting a draw from Treasury under the senior preferred stock purchase agreement."

64.     Although Freddie Mac was also in conservatorship and had to draw on the
Government's funding commitment to pay the Government dividends on the Government's
senior preferred stock, Freddie Mac was able to generate quarterly profits for certain quarters
even before 2012. For example, in its Form 10-Q for the quarter ended June 30, 2009, filed with
the SEC on August 7, 2009, Freddie Mac reported a quarterly profit of $800 million, and in its
Form 10-Q for the quarter ended March 30, 2011, filed with the SEC on May 4, 2011, Freddie
Mac reported a quarterly profit of $2.7 billion.

65.     By the first quarter of 2012, Freddie Mac began to generate quarterly profits on a
consistent basis. In its Form 10-Q for the quarter ended March 30, 2012, filed with the SEC on
May 3, 2012, Freddie Mac reported a quarterly profit of $1.8 billion, and in its Form 10-Q for the

quarter ended June 30, 2012, filed with the SEC on August 7, 2012, Freddie Mac reported a quarterly profit of $2.9 billion.

## The Net Worth Sweep

66.    With Fannie Mae and Freddie Mac's return to consistent profitability, the holders of Fannie Mae and Freddie Mac Junior Preferred Stock began to see some light at the end of the tunnel. Although Fannie Mae and Freddie Mac were still in conservatorship, Fannie Mae and Freddie Mac's rapidly growing profitability and net worth gave the Junior Preferred Stockholders reason to believe that Fannie Mae and Freddie Mac would soon be financially healthy enough to begin paying dividends on the Junior Preferred Stock even after paying the 10% annual dividend on the Treasury's Senior Preferred Stock (as Fannie and Freddie were able to do as of no later than the second quarter of 2012), or to redeem the Government's Senior Preferred Stock, exit conservatorship, and resume paying regular dividends on the Junior Preferred Stock. Alternatively, even if Fannie and Freddie were gradually wound down or liquidated, their profitability reflected the value of their underlying assets, and any reasonable liquidation would generate more than enough value to payoff the Senior Preferred Stock held by the Treasury while yielding substantial additional value for the holders of Junior Preferred Stock.

67.    Thus, the return of Fannie and Freddie to substantial and consistent profitability in 2012 led to an increase in the trading prices of the Fannie Mae and Freddie Mac Junior Preferred Stock, which began to increase substantially, on average by 83% and 86%, respectively, from the beginning of May 2012 to August 2012, as demonstrated below:

### Fannie Mae

| Series | 5/1/12 Closing Price | 8/16/12 Closing Price | % Change |
|--------|----------------------|-----------------------|----------|
| F      | $1.95                | $3.25                 | +67%     |

| G | $1.95 | $3.31 | +70% |
| H | $1.95 | $3.50 | +79% |
| I | $2.05 | $3.42 | +67% |
| L | $1.80 | $3.40 | +89% |
| M | $1.81 | $3.22 | +78% |
| N | $1.82 | $3.25 | +79% |
| O | $2.11 | $3.30 | +56% |
| P | $1.04 | $1.90 | +83% |
| Q | $0.98 | $1.99 | +115% |
| R | $1.01 | $1.95 | +93% |
| S | $1.19 | $2.35 | +97% |
| T | $1.30 | $2.65 | +104% |

**Freddie Mac**

| Series | 5/1/12 Closing Price | 8/16/12 Closing Price | % Change |
| --- | --- | --- | --- |
| B | $1.80 | $3.18 | +77% |
| 5.81% (1997) | $1.55 | $3.30 | +113% |
| F | $1.80 | $3.45 | +92% |
| G | $1.80 | $3.25 | +81% |
| H | $1.90 | $3.55 | +87% |

27

| | | | |
|---|---|---|---|
| 5.3% (1998) | $1.80 | $3.95 | +119% |
| 5.1% (1999) | $2.75 | $2.90 | −5% |
| K | $1.83 | $3.55 | +94% |
| L | $2.00 | $3.30 | +65% |
| M | $1.82 | $3.00 | +65% |
| N | $1.95 | $3.30 | +69% |
| O | $1.83 | $3.35 | +83% |
| P | $1.90 | $3.93 | +107% |
| Q | $1.85 | $3.24 | +75% |
| R | $1.82 | $3.95 | +117% |
| 5.81% (2002) | No historical data | No historical data | N/A |
| S | $2.00 | $3.20 | +60% |
| T | $1.85 | $3.85 | +108% |
| U | $1.25 | $2.30 | +84% |
| V | $1.25 | $2.20 | +76% |
| W | $1.01 | $1.90 | +88% |
| X | $1.01 | $1.86 | +84% |
| Y | $1.03 | $2.11 | +105% |
| Z | $1.18 | $2.83 | +140% |

68.     Indeed, even the increased prices for the Junior Preferred Stock, shown above, likely understated the true value of the Junior Preferred Stock as of August 2012. The Junior Preferred Stock had been de-listed during the conservatorship, leading to a less liquid market that in many instances fails to reflect accurately the true value of the underlying security. Nevertheless, the overall increase in pricing did reflect the clear market reality that Fannie and Freddie had become profitable again, there was (and is) every reason to believe that profitability will continue and increase over time, and their combined profits would be more than sufficient to satisfy all financial obligations attributable to the Senior Preferred Stock (whether through ongoing dividends, redemptions, liquidation preferences or otherwise) while still yielding substantial additional value for the Junior Preferred Stockholders.

69.     The optimistic mood came to a crashing halt, however, on August 17, 2012, when the Treasury Department issued a news release announcing that it had modified the Agreements with Fannie Mae and Freddie Mac governing the Senior Preferred Stock through a Third Amendment providing that the dividends Fannie Mae and Freddie Mac are required to pay the Government would increase from 10% of the value of the Senior Preferred Stock to an *unlimited amount* equal to Fannie Mae and Freddie Mac's *entire net worth*.

70.     The Treasury described the terms of this Third Amendment, described herein as the "Net Worth Sweep," as a *"Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment,"* and stated that *"**The agreements will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward**."* Specifically, as shown below, the Net Worth Sweep provides that beginning as of January 1, 2013, Fannie and Freddie must pay Treasury a quarterly dividend

equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018. This means that any increase in the net worth of Fannie or Freddie flowing from net income or other comprehensive income will automatically be swept to the Treasury *in its entirety*, no matter how large that increase in net worth is, or how much it exceeds the 10% dividend provided for in the Agreements governing the Senior Preferred Stock.

71.     The Treasury stated that one of the objectives of the Net Worth Sweep was, "***Making sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms.***" In other words, the purpose was to take any and all profits of Fannie and Freddie, no matter how much they exceeded the actual rights given to Treasury through its Senior Preferred Stock, and to leave absolutely nothing for the holders of the Junior Preferred Stock.

72.     The Treasury also stated that the Net Worth Sweep was designed to fulfill the "***the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form.***" Thus, the Treasury's intent is to ensure that Fannie and Freddie can never generate profits for the holders of the Junior Preferred Stockholders.

73.     The Treasury also stated that the Net Worth Sweep would require Fannie and Freddie to wind down their mortgage portfolios at a faster rate than previously required:

> *Accelerated Wind Down of the Retained Mortgage Investment Portfolios at Fannie Mae and Freddie Mac*
>
> The agreements require an accelerated reduction of Fannie Mae and Freddie Mac's investment portfolios. Those portfolios will now be wound down at an annual rate of 15 percent - an increase from the 10 percent annual reduction required in the previous agreements. As a result of this change, the GSEs' investment

portfolios must be reduced to the $250 billion target set in the previous agreements four years earlier than previously scheduled.

74.     Also on August 17, 2012, Fannie Mae filed with the SEC a Form 8-K disclosing

further details of the Third Amendment to the Agreement and the Net Worth Sweep:

> For each dividend period from January 1, 2013 through and including December 31, 2017, *the dividend amount will be the amount, if any, by which our net worth as of the end of the immediately preceding fiscal quarter exceeds an applicable capital reserve amount. The applicable capital reserve amount will be $3 billion for 2013 and will be reduced by $600 million each year until it reaches zero on January 1, 2018*. For each dividend period thereafter, the dividend amount will be the amount of our net worth, if any, as of the end of the immediately preceding fiscal quarter.

> Our net worth as defined by the agreement is the amount, if any, by which our total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceed our total liabilities (excluding any obligation in respect of capital stock), in each case as reflected on our balance sheet prepared in accordance with generally accepted accounting principles. If we do not have a positive net worth or if our net worth does not exceed the applicable capital reserve amount as of the end of a fiscal quarter, then no dividend amount will accrue or be payable for the applicable dividend period.

> * * *

> In addition to the above-described amendments, the amendment also requires that Fannie Mae amend or replace the existing Certificate of Designation for the senior preferred stock to reflect the revised dividend payment provisions described above by no later than September 30, 2012.

> (Emphasis added).

75.     As the foregoing comments make clear, the purpose of the Net Worth Sweep was

to advance the Government's policy goals of "benefit[ing] taxpayers" and "winding down Fannie

Mae and Freddie Mac," in a manner that ensured Fannie Mae and Freddie Mac would not, "retain profits, rebuild capital, and return to the market in their prior form."

76.     The Net Worth Sweep appropriates the entire economic value of the Junior Preferred Stock. It literally appropriates for the benefit of the Treasury all of the economic value that could ever be paid out on the Junior Preferred Stock, and makes it impossible for the Junior Preferred Stock ever to receive a dividend or any other form of distribution from either Fannie or Freddie, whether in liquidation or otherwise. It therefore understandably had a devastating effect on the over-the-counter trading prices of shares of the Fannie Mae and Freddie Mac Junior Preferred Stock series, all of which immediately collapsed by well over 50% the day the Net Worth Sweep was announced.

### The Government's Imposition of the Net Worth Sweep Was a Taking of Plaintiff' and the Class' Vested Property Rights Without Just Compensation.

77.     Prior to the imposition of the Net Worth Sweep, Plaintiff and the members of the Class had vested property rights in their shares of Fannie Mae and Freddie Mac Junior Preferred Stock, including, but not limited to, the right to receive dividends and the right to receive their respective liquidation preferences in accordance with the provisions of the Certificates of Designation, as described and set forth above. These economic rights included the right to participate in the profits and increased net worth of Fannie and Freddie (whether through dividends, redemptions, liquidation or otherwise) to the extent those profits and increased net worth exceeded the amounts needed to fully satisfy all obligations on the Senior Preferred Stock.

78.     The economic rights owned by the holders of Fannie and Freddie Junior Preferred Stock vested in their respective holders upon the holders' acquisition of shares of Fannie Mae and Freddie Mac Junior Preferred Stock.

79.     The economic rights owned by Plaintiff and the Class constitute private property protected by the Fifth Amendment of the United States Constitution.

80.     Prior to the imposition of the Net Worth Sweep, the property owned by Plaintiff and the Class had a positive value measured in the billions of dollars.

81.     Prior to the imposition of the Net Worth Sweep, Plaintiff and the Class had a reasonable, investment-backed expectation that their property would not be appropriated by the Government without payment of just compensation. The rights associated with the Junior Preferred Stock were an essential part of the Fannie Mae and Freddie Mac Junior Preferred Stock, and Plaintiff and the Class invested in the Junior Preferred Stock based upon the economic value of those rights.

82. .   The Government's imposition of the Net Worth Sweep, which the Government effectuated unilaterally pursuant to the FHFA's authority as conservator of Fannie Mae and Freddie Mac, deprived Plaintiff and the members of the Class of all economic value in the Junior Preferred Stock, and thereby appropriated their property without payment of just compensation.

83.     The Net Worth Sweep has made it impossible for Plaintiff and the members of the Class ever to receive dividends or their respective liquidation preferences, or any portion thereof, because the Net Worth Sweep has the purpose and effect of ensuring that Fannie Mae and Freddie Mac will never have any funds available to pay a dividend on the Junior Preferred Stock, to redeem the Government's Senior Preferred Stock, or to pay any liquidation proceeds to the holders of Junior Preferred Stock. Thus, Fannie and Freddie will never have any funds available to pay dividends or liquidation distributions to the holders of the Junior Preferred Stock. The Net Worth Sweep permanently deprives Plaintiff and the Class of their right to receive either dividends or their respective liquidation distributions upon liquidation of Fannie

33

Mae and Freddie Mac *no matter how much net worth* Fannie Mae and Freddie Mac otherwise would have accumulated.

84.   The Government's imposition of the Net Worth Sweep has rendered Plaintiff's and the Class' economic rights a nullity and completely eliminated the value of those rights.

85.   The Government's imposition of the Net Worth Sweep had the purpose and effect of placing the burden of a public program designed and intended to benefit taxpayers, the Government, and the economy generally, disproportionately on the relatively small group of Fannie Mae and Freddie Mac Junior Preferred Stockholders rather than on the public as a whole.

86.   Although the Government plainly has many other means of raising revenue and supporting the economic recovery that would not appropriate the economic value of the Junior Preferred Stock, the Net Worth Sweep has become a major revenue generator for the Government at the expense of Plaintiff and the Class.

87.   On May 9, 2013, *Politico* reported:

> Fannie Mae will send its largest check yet to taxpayers this summer: $59.4 billion.
>
> The government-owned mortgage finance company has been turning a profit in recent quarters thanks to the recovering housing market and the rapid pace of mortgage refinancings spurred on by the Federal Reserve's cheap money policies.
>
> On Thursday, Fannie announced the uptick in profits will allow it to take advantage of certain tax benefits on losses that were deferred as the company was taken over by the government in 2008. This boosts the company's net worth and frees up $50.6 billion for the government under the terms of the bailout agreement.
>
> This amount combined with the $8.1 billion first-quarter profit reported Thursday, the largest gain in its history, means the company will send the government $59.4 billion by June 30.

* * *

Lawmakers on the Senate Banking and House Financial Services committees have said the new profits should not delay reform further, but with the budget already tight, keeping the continued flow of cash in place could be tempting.

"Washington could quickly get addicted to the revenue from Fannie and Freddie," Guggenheim Partners analyst Jaret Seiberg said in a note to clients.

Under the terms of the bailout agreement, Fannie and Freddie cannot get out from under government control simply by paying back the taxpayer money they have received because Treasury owns preferred shares in the company.

As of June 30, Fannie will have paid Treasury $95 billion in dividend payments under its conservatorship agreement while Treasury will still hold $117 billion in preferred shares in the company.

Should the government keep control of the companies for another 10 years, the Obama administration budget projects taxpayers could get $51 billion more back from Fannie and Freddie than the $187 billion they put into the two firms.

A Treasury Department official confirmed that the funds returned by Fannie and Freddie will be deposited into the general fund and will be factored into how long the department can continue to pay the government's bills before running up against the debt ceiling.

The $59 billion Fannie will send, combined with the $7 billion Freddie said it would pay the Treasury by June 30, would likely push back the date when the government will breach the debt ceiling until October, if it is not raised before then, the Bipartisan Policy Center said today.

Laurie Goodman, a top analyst at Amherst Securities, said rising home prices, coupled with higher fees Fannie and Freddie charge new home buyers, will keep the companies profitable for some time.

"I think the profits are sustainable. They have raised [fees] very, very considerably," Goodman said in an interview. "And bad loans are running off."

35

88.     On May 10, 2013, Fitch Ratings issued a report stating "[w]e believe the cumulative dividends paid by Fannie could exceed the $117 billion in senior preferred stock owned by the Treasury by late this year or early 2014, based on the current earnings run-rate."

89.     While the Government has been collecting, and will continue to collect, billions of dollars from Fannie Mae and Freddie Mac, Plaintiff and the Class have not been provided just compensation, nor any compensation, for the Government's taking of all of the economic rights associated with their Junior Preferred Stock.

## COUNT I

### Against the United States of America
### for Just Compensation Under the Fifth Amendment

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     The Fifth Amendment provides that no person shall, "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

92.     By imposing the Net Worth Sweep, the Government took Plaintiff's and the Class' vested property rights without just compensation, as alleged herein.

93.     Plaintiff and the Class are entitled to just compensation for the Government's taking of their property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Certifying this action as a class action and Plaintiff as Class representatives;

B.     Awarding Plaintiff and the Class just compensation for the Government's taking of their property;

C.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

Dated:  July 19, 2013                                          Respectfully submitted,

**BROWER PIVEN**
  **A Professional Corporation**

Charles J. Piven
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone:  410-332-0030
Facsimile:  410-685-1300
Email: piven@browerpiven.com

**POMERANTZ GROSSMAN HUFFORD**
  **DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD**
  **DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

37